UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------ X
**ROGER ESTED,**                                              :

             Petitioner,                  :

                            :  **MEMORANDUM**
         - against -                   .  **DECISION AND ORDER**
**WILLIAM LEE,**                                             .  16–CV–7008 (AMD)

                            :

             Respondent.
------------------------------------------------------------------ X

**ANN M. DONNELLY,** United States District Judge.

The *pro se* petitioner, currently incarcerated at Eastern New York Correctional Facility, petitions for a writ of habeas corpus pursuant to 28 U.S.C. Section 2254. On August 4, 2011, the petitioner was convicted after a jury trial of Attempted Murder in the Second Degree (N.Y. Penal Law §§ 110.00/125.25[1]), Assault in the Second Degree (N.Y. Penal Law § 120.05[02]), Criminal Possession of a Weapon in the Second Degree, (N.Y. Penal Law § 265.03[1][b]), and Criminal Possession of a Weapon in the Fourth Degree (N.Y. Penal Law § 265.01[1]). On August 31, 2011, the court sentenced the petitioner to a determinate prison term totaling 24 years, with five years' post-release supervision. The petitioner claims that he was deprived of his right to represent himself and that his sentence was excessive. (ECF No. 1 at 6, 8.) The petitioner also claims that the court violated his right to be free from double jeopardy. (*Id.* at 5.) For the reasons that follow, the petition is denied.

## FACTUAL BACKGROUND

### I.   Overview

On January 15, 2008, shortly before 11:30 p.m., the petitioner shot his former girlfriend, Shellianne Bowens, multiple times in the presence of her five-year-old daughter. The petitioner was charged with Attempted Murder in the Second Degree, and related charges.

1

## II.   Mistrial

The petitioner's first trial began before the Honorable Joseph J. McKay on May 18, 2010.

On the fourth day of trial, the petitioner's attorney, Julie Clarke[1], moved for a mistrial because

her mother had died that morning. (ECF No. 10-1, T1: 2:4-15.)[2] Ms. Clarke told the court that

the petitioner understood that she was in "no condition to proceed with [the] trial," and consented

to the motion for mistrial. (*Id.*) The court and the parties agreed that Ms. Clarke's emotional

state and funeral obligations would make it a "practical impossibility" to continue the trial. (*Id.*

at 3.) Judge McKay confirmed that Ms. Clarke would not be available for "at least a week," that

there was no way to "ask the jury to come back in a week and a half," and that the petitioner,

who was present in court, "under[stood] and consent[ed]" to the mistrial. (Id. at 3:8-20.)

Judge McKay considered the question of double jeopardy, citing a case in which jeopardy

had attached, but which was "just drastically different from our case," because "the trial judge

there did not get the consent or even consult defense when he declared a mistrial based on a

death in the family." (*Id.* at 5:3-9.) The petitioner, in contrast, consented, so the court declared a

mistrial. (*Id.* at 6:3-4.)

The court subsequently relieved Ms. Clarke because of a breakdown in communications

and appointed Douglas Appel, who was relieved when he also had a breakdown in

communications with the petitioner. (*Id.*) The court appointed a fourth attorney, Robert

Nicholson, who represented the petitioner at his second trial.

---

[1] Ms. Clarke, appointed by the court, was the petitioner's second attorney. (ECF No. 10-1, H1: 41:8-42:24.) The petitioner's family retained his first lawyer. (*Id.*)

[2] Numbers in parentheses preceded by "T1:" refer to the trial transcript dated May 21, 2010, those preceded by "H1:" refer to the hearing transcript dated July 25, 2011, those preceded by "H2:" refer to the hearing transcript dated July 26, 2011, and those preceded by "H3:" refer to the hearing transcript dated July 27, 2011.

### III. *Pro Se* Determination

#### a. July 25 Hearing

On July 25, 2010, immediately before jury selection was to begin in the petitioner's trial before the Honorable John Ingram, Mr. Nicholson informed the court that the petitioner "has suddenly requested that he be allowed to be a *pro se* in this[.]" (*Id.* at 3:3-6.) The court explained to the petitioner that he had the constitutional right to represent himself if his decision was knowing, voluntary, intelligent, and unequivocal. (*Id.* at 7:4-11.) The court conducted a detailed colloquy with the petitioner about his education, psychiatric and criminal history, and general background, establishing that the petitioner did not finish high school, had never represented himself, and had a basic understanding of the charges against him, but little knowledge of criminal law or procedure. (*Id.* at 9-11, 17-25.)

Judge Ingram asked the petitioner why he wanted to represent himself "and not be represented by Mr. Nicholson." (*Id.* at 29:25-30:1.) The petitioner responded with a series of complaints about his lawyer, who he claimed had met with him only a few times and had not returned his calls. (*Id.* at 30:2-25.) Judge Ingram gave the petitioner two alternatives: "You want me to go forward with this hearing on letting you go pro se and we'll conclude the hearing sometime this afternoon, I will make a decision whether you are fit to go by yourself, or do you want me to stop this right now and hear your application for a new lawyer?" (*Id.* at 34:19-35:1.) The petitioner responded, "Yes, I would like to hear my application for a new lawyer." (*Id.* at 35:2-3.) Judge Ingram conducted a detailed inquiry, and ultimately denied the petitioner's request for a new lawyer. (*Id.* at 59-65, 68:20-69:2.) The judge noted that the petitioner was on his fourth lawyer, that the request was made on the eve of trial with a jury panel waiting, and that Mr. Nicholson was an experienced and competent lawyer. (*Id.*) Judge Ingram also concluded

that the petitioner's request to proceed *pro se* arose out of his dissatisfaction with his attorney and that what the petitioner really wanted was another lawyer. (*Id.* at 59:7-24.) Under these circumstances, Judge Ingram concluded that the petitioner's request to represent himself was not unequivocal. (*Id.* at 59, 69:3-7.)

The issue came up again the next day, July 26th, when Judge Ingram asked whether the petitioner "agree[d] to go forward with Mr. Nicholson as [his] attorney." (ECF No. 10-1, H2: 9:2-4.) The petitioner answered that he did not wish to have Mr. Nicholson, and that he wanted to represent himself because he felt that he was "much more familiar with the case" than counsel. (*Id.* at 9:7-17.) The judge conducted another detailed colloquy during which he advised the petitioner of the many pitfalls of self-representation. (*Id.* at 10-20.) Judge Ingram reminded the petitioner of the number of witnesses against him, the experience of his adversaries, and the fact that any legal advisor would be permitted only to sit "in the front row," not at the petitioner's side. (*Id.*) The petitioner asked for an additional day to think about what he wanted to do and to talk with Mr. Nicholson, which the judge granted. (*Id.* at 17:16-18, 23:15-17.)

### b. July 27 Hearing

The next day, July 27th, Judge Ingram asked the petitioner about his decision:

> THE COURT: ...I gave you all the instructions regarding *pro se*. I believe you told me that you wanted to think about it until this morning. And you had also indicated previously that the reason why you were asking to go *pro se* was because you weren't satisfied with your assigned counsel, Mr. Nicholson. I have heard from Mr. Nicholson, I have discussed in open court with you present and of course with the People. It does seem that Mr. Nicholson has vigorously prepared for the defense of this matter.
>
> So, what is it you want today?
>
> THE PETITIONER: I would like to go *pro se*.
>
> THE COURT: And the sole reason that you wish to go *pro se* is because you are dissatisfied with your attorney?

4

THE PETITIONER: And I feel like I know all the facts of the case.

THE COURT: Okay. The reason, the sole reason is you are not satisfied with Mr. Nicholson's representation, correct?

THE PETITIONER: Yes.

THE COURT: Okay.

And the Court at this time is not substituting another counsel because of the very late application that you made regarding your dissatisfaction with your assigned counselor. Under the circumstances the Court is going to adhere to its prior ruling and the Court denies your application to proceed *pro se*. I look at your request in light of the record before us and I cannot conclude that you have made an unequivocal request to proceed *pro se*. The Court notes that the sole request by you to represent yourself was equivocal because you made the request as a way of obtaining the dismissal of assigned counsel...The Court will deny your request. Mr. Nicholson will be your trial counsel.

(ECF No. 10-2, H3: 2:25-4:16.)

## IV. The Trial and Sentencing Proceeding

The evidence at trial established that the victim, Shellianne Bowens, met the petitioner when she was 18 years old, in New York. (ECF No. 10-3 at 7:1-23.) The relationship was marked by violence; the petitioner controlled her relationships with friends and family, slapped her, and threatened to kill her if she was unfaithful. (*Id.* at 11-16.) In late 2007, Ms. Bowens ended the relationship, but the two continued to talk. (*Id.* at 16:21-17-7.)

On the night of January 15, 2008, the petitioner arrived at Ms. Bowens' apartment, where she lived with her five-year-old daughter, demanding to know how she had gotten home. (*Id.* at 24-25.) The petitioner woke up Ms. Bowens' child, and ordered her to tell him who had driven them home, and grabbed Ms. Bowens' cell phone when she tried to call the police. (*Id.* at 25-27.) The petitioner shot Ms. Bowens four times, striking her twice in the arm and twice in the abdomen, and left the apartment. (*Id.* at 29-33:13.) Detectives found him in a parking lot three hours later; he was inside a parked car, holding his gun. (ECF No. 10-5 at 312:6-24.) After

detectives arrested him, the petitioner admitted that he had taken out a gun during an argument with the victim, but did not know that he had shot her. (*Id.* at 328:15-16.) Ballistics testing and comparison confirmed that the petitioner's gun fired the bullets that struck Ms. Bowens. (ECF No. 10-4 at 252:16-253:2.)

On August 4, 2011, the jury convicted the petitioner of Attempted Murder in the Second Degree, Assault in the Second Degree, Criminal Possession of a Weapon in the Second Degree, and Criminal Possession of a Weapon in the Fourth Degree. (ECF No. 10-6, Verdict, at 534-36.) On August 31, 2011, Judge Ingram found that the circumstances of the crime—shooting the victim multiple times in front of her young child—as well as his criminal history, warranted a sentence near the maximum, and sentenced the petitioner to a determinate prison term of twenty-four years for the attempted murder, and concurrent, determinate sentences of thirteen years for the gun possession, seven years for the assault, and a year for the misdemeanor weapon count.[3] (ECF No. 10-6, Sentencing, at 11-17.)

## PROCEDURAL HISTORY

The petitioner, represented by counsel, appealed his conviction to the Appellate Division, Second Department. In his main brief, the petitioner claimed that he should have been permitted to represent himself, that his sentence was excessive, and that the misdemeanor weapon count should have been dismissed as an inclusory concurrent count.[4] (ECF No. 10-7, Ex. B, at 3.) In his *pro se* supplemental brief, the petitioner raised four additional claims: (a) that he had standing to challenge the police officers' search of a public parking lot; (b) that the grant of a mistrial during his first trial violated the double jeopardy clause; (c) that his counsel provided ineffective

---

[3] The court also imposed concurrent terms of post-release supervision.

[4] The prosecution agreed that the court should vacate the petitioner's conviction for criminal possession of a weapon in the fourth degree. (*See* ECF No. 10-7, Ex. C, at 44-45.)

assistance; and (d) that the prosecution committed multiple *Brady* violations. (ECF No. 10-7, Ex. D., at 3.)

The appellate court vacated the misdemeanor conviction, but affirmed the petitioner's judgment in all other respects. *See People v. Ested*, 129 A.D.3d 858 (N.Y. App. Div. 2015). The court held the petitioner's request to represent himself was not unequivocal, but "was made in the context of expressing dissatisfaction with assigned counsel and as an alternative to his request for substitution of counsel, and, thus, the request did not 'reflect an affirmative desire for self-representation.'" *Id.* at 859 (citation omitted). The Appellate Division also held that the petitioner's sentence was not excessive, that his double jeopardy claim was without merit, and that he had no standing to challenge the search of the parking lot. *Id.* at 859-60.

The New York Court of Appeals denied the petitioner's application for leave to appeal his self-representation claim. *People v. Ested*, 44 N.E.3d 942 (2015) (Lippman, C.J.). The petitioner moved for reconsideration of all of his claims, which the Court of Appeals denied. *People v. Ested*, 56 N.E.3d 905 (2016) (DiFiore, C.J.).

On December 30, 2016, the petitioner filed his habeas corpus petition pursuant to 28 U.S.C. Section 2254, and raises the following claims: (1) the trial court deprived him of his right to represent himself; (2) the court's agreement to his lawyer's request for a mistrial during the first trial violated the double jeopardy clause; and (3) his sentence was excessive.[5] (ECF No. 1 at 5, 6, 8.)

## LEGAL STANDARD

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") requires a

---

[5] The petitioner also raised claims of ineffective assistance of counsel and prosecutorial misconduct but acknowledged that he did not raise them in state court. On March 28, 2017, I ordered that these unexhausted claims be treated as though the petitioner had deleted them from the petition. (See ECF No. 6.)

federal court reviewing a state prisoner's habeas petition to give deference to a state court's decision on the merits. 28 U.S.C. § 2254(a); *Chrysler v. Guiney*, 806 F.3d 104, 116-17 (2d Cir. 2015). The federal court may not issue a writ of habeas corpus unless the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law" or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *see also Johnson v. Williams*, 568 U.S. 289, 292 (2013); *Chrysler*, 806 F.3d 104 at 116-17.

For the purposes of federal habeas review, "clearly established law" means "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000). It does not include principles of constitutional law grounded solely in the holdings of courts of appeals or refinements of general principles of Supreme Court precedent into specific rules. *See Jackson v.* Conway, 763 F.3d 115, 134 (2d Cir. 2014) (*citing Parker v. Matthews*, 567 U.S. 37, 48-49 (2012); *see also Marshall v. Rodgers*, 569 U.S. 58, 64 (2013)).

A state court decision is "contrary to" or an "unreasonable application of" clearly established law if the decision: (1) is contrary to Supreme Court precedent on a question of law; (2) arrives at a conclusion different than that reached by the Supreme Court on "materially indistinguishable" facts; or (3) identifies the correct governing legal rule but unreasonably applies it to the facts of the petitioner's case. *Williams*, 529 U.S. at 412-13. In assessing whether a state court decision involves an "an unreasonable application of …clearly established" federal law, the question is "whether the state court's application of federal law was objectively unreasonable," rather than merely incorrect. *Id.* at 409-10. A state court prisoner must show that "the state court's ruling on the claim being presented in federal court was so lacking in

8

justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

A petitioner can seek federal habeas corpus relief only after he exhausts state court remedies, and gives the state courts a fair and full opportunity to review the merits of the claim. 28 U.S.C. § 2254(b)(1); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999). In other words, a petitioner must present "the essential factual and legal premises of his federal constitutional claim to the highest state court capable of reviewing it." *Jackson v. Conway*, 763 F.3d 115, 133 (2d Cir. 2014).

## DISCUSSION

### I. Pro se Determination

The Sixth Amendment grants a criminal defendant the right to represent himself at trial, *Faretta v. California*, 422 U.S. 806, 819-21 (1975), but the accused must "knowingly and intelligently" forgo the benefits associated with the right to counsel. *Id.* at 835 (citation omitted). "Although a defendant need not himself have the skill and experience of a lawyer in order competently and intelligently to choose self-representation, he should be made aware of the dangers and disadvantages of self-representation, so that the record will establish 'he knows what he is doing and his choice is made with eyes open.'" *Id.* (citation omitted).

The Appellate Division rejected the petitioner's claim that the trial judge violated his right to self-representation. *See People v. Ested*, 129 A.D.3d 858 (N.Y. App. Div. 2015). That decision was not an objectively unreasonable application of *Faretta*.

Over the course of three days, the trial judge engaged in detailed colloquies with the petitioner. The judge warned him about the many risks of representing himself rather than being represented by a trial lawyer with "a comprehensive knowledge of the rules of evidence as well

as an understanding of the art of jury selection and the art of cross-examination." (ECF No. 10-1, H2: 10-11.) Each time that the court asked the petitioner to confirm that he wanted to proceed *pro se*, the petitioner either complained about his lawyer's abilities or asked for yet another lawyer.

On July 25, 2011, after a lengthy discussion about representing himself, the petitioner complained about his attorney, and told the judge that he would rather get a new attorney than continue with the *pro se* inquiry. THE COURT: "You want me to go forward with this hearing on letting you go pro se and we'll conclude the hearing sometime this afternoon.... or do you want me to stop this right now and hear your application for a new lawyer?" THE PETITIONER: "Yes, I would like to hear my application for a new lawyer." (ECF No. 10-1, H1: 33:15-35:3.)

The next day, the petitioner continued criticizing his lawyer and expressed surprise that his lawyer would not be "at his side" if he represented himself. THE COURT: "Do you understand that in choosing to represent yourself you are not entitled to any aid from an attorney throughout these proceedings at all?" [] THE PETITIONER: "I thought I was – no, I thought I was having an advisor by my side." (ECF No. 10-1, H2: 9:2-12:2.) On July 27, 2011, the petitioner reiterated that he asked to go *pro se* only because he was dissatisfied with his counsel. (ECF No. 10-2, H3: 2:24-3:19.)

On these facts, the Appellate Division determined that the petitioner did not make an unequivocal request to represent himself, because he was motivated by a wish to get another lawyer, rather than an affirmative desire to represent himself. *See People v. Ested*, 129 A.D.3d 858, 859 (N.Y. App. Div. 2015). The court's determination was not an objectively unreasonable application of the Supreme Court's holding in *Faretta*.

## II.     Procedural Default

Before turning to the petitioner's double jeopardy and excessive sentence claims, I address the respondent's footnoted argument that the petitioner's claims are barred because he did not raise them when he applied for leave to appeal to the New York Court of Appeals. (ECF No. 10 at n. 3, 4.) Under 28 U.S.C. Section 2254(b), applicants for habeas corpus relief must "exhaust[] the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A). "In doing so, a petitioner must present his federal constitutional claims to the highest court of the state before a federal court may consider the merits of the petition." *Grey v. Hoke*, 933 F.2d 117, 119 (2d Cir. 1991) (citation omitted); 28 U.S.C. § 2254(c). A habeas petitioner who fails to meet the state's procedural requirements for presenting his federal claims "has deprived the state courts of an opportunity to address those claims in the first instance," *Coleman v. Thompson*, 501 U.S. 722, 732 (1991), and "when a prisoner has deprived the state courts of such an opportunity, he has procedurally defaulted his claims." *Galdamez v. Keane*, 394 F.3d 68, 73 (2d Cir. 2005) (citation omitted).

Under New York law, to invoke "one complete round of the State's established appellate review process," *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999), a criminal defendant must first appeal to the Appellate Division, and then seek further review of that conviction by applying to the Court of Appeals for a certificate granting leave to appeal. *Galdemez*, 394 F.3d at 74 (citing N.Y. Crim. Proc. Law § 460.20 (McKinney 1994)). New York Court rules require that leave applicants submit to the Court of Appeals briefs and other documents from the lower courts, and identify "the grounds upon which leave to appeal is sought" with "[p]articular written attention [to] reviewability and preservation of error." N.Y. Ct. Rules § 500.20 (McKinney 2019).

The failure to include claims in an application to the Court of Appeals will, in certain circumstances, be interpreted by a federal court as a procedural default of those claims. For example, in *Grey v. Hoke*, 933 F.2d at 120, Grey submitted an application consisting of his brief to the Appellate Division raising three claims, and a letter to the Court of Appeals requesting review of only one claim. *Id.* at 120. The Second Circuit held that Grey had abandoned the two claims, and treated them as procedurally defaulted. *Id.* By contrast, in *Galdamez*, 394 F.3d at 75-77, Galdamez did not specify the claims for which he was seeking leave to appeal, and simply enclosed the briefs and decisions below. The court interpreted this application as a request for further appellate review of all issues in the attached briefs.

Here, as in *Galdamez*, the petitioner's initial leave application included the briefs and decisions below with no discussion of his specific claims.[6] (ECF No. 10-8 at 2-3.) Moreover, the respondent identified the excessive sentence and double jeopardy claims in its letter in opposition to the petitioner's leave application. (*Id.* at 9.) Under these circumstances, the petitioner's federal claims were fairly presented to the Court of Appeals and are not procedurally barred.

## III.    Double Jeopardy

The Double Jeopardy Clause of the Fifth Amendment protects a defendant in a criminal proceeding against multiple punishments or repeated prosecutions for the same offense. *U.S. v. Dinitz*, 424 U.S. 600, 606 (1976). In the context of a mistrial, whether double jeopardy bars re-prosecution depends on whether the defendant sought or consented to the mistrial. When the defendant has requested or consented to the mistrial, he may be tried again unless the judge or

---

[6] The petitioner's follow-up letter highlighting only the *pro se* issue does not serve to "eliminat[e] issues as to which review had been expressly requested." *Morgan v. Bennett*, 204 F.3d 360, 371 (2d. Cir. 2000).

the prosecutor intentionally provoked the defendant to request or consent to the mistrial. *See*

*Oregon v. Kennedy*, 456 U.S. 667, 672-679 (1982). By contrast, where the court declares a

mistrial without the defendant's request or consent, a new trial is barred by double jeopardy

unless there was a manifest necessity for the mistrial. *Id.* at 672. A defendant's consent to a

mistrial need not be knowing, voluntary, and intelligent. *Dinitz*, 424 U.S. at n.11 ("This Court

has implicitly rejected the contention that the permissibility of a retrial following a

mistrial...depends on a knowing, voluntary, and intelligent waiver of a constitutional right.").

The Appellate Division rejected the petitioner's double jeopardy claim, a decision that

was not an objectively unreasonable application of the Supreme Court's holdings in *Dinitz* and

*Kennedy*. On the fourth day of the petitioner's first trial, his lawyer at the time, Julie Clarke,

asked the judge to declare a mistrial because her mother had died that morning, an application to

which the petitioner consented:

> I was informed this morning that my mother did pass and I have spoken to Mr.
> Ested. He understands that I am in really no condition to proceed with this trial.
> So with his consent, I am making a motion for mistrial, and asking this case be
> put over for a couple weeks.

(ECF No. 10-1, T1: 2:4-15.)

The presiding judge confirmed that the petitioner agreed to the mistrial. On appeal, the

petitioner argued that New York law required his personal consent to a mistrial, not just the

consent of his attorney. (ECF No. 10-7, Ex. D, at 30-31.) In his habeas petition, the petitioner

argues for the first time that Ms. Clarke could not consent to the mistrial on his behalf:

> 4. When a defendant accepts the assistance of counsel to represent
> him/her in trial, counsel has the authority over certain decisions as in
> seeking a mistrial, however in this case the petitioner did not accept Mrs.
> Julie A. Clark[e] as his trial counsel to give her that authority.
> ....
> 7. The above statements show that the petitioner never accepted Mrs.
> Clark[e] as his counsel to give her authority in his case. There was a clear

> conflict of interest. Mrs. Clark[e] had represented petitioner's niece in a
> civil suit, and petitioner's father had stated to him at that time Mrs.
> Clark[e] representation was very poor.

(ECF No. 16 at 7-10.)

This argument is not cognizable on habeas review because it was not fairly presented to

the state court. *See, e.g., Jackson v. Conway,* 763 F.3d 115, 143 (2d Cir. 2014) (because the

petitioner presented a new example of prosecutorial misconduct on habeas that he had not raised

in state court, that portion of the prosecutorial misconduct claim was unexhausted); *see also,*

*Postell v. Bradt,* 2017 WL 1214933, at *4 (S.D.N.Y. Mar. 31, 2017). Nor are there additional

state avenues in which the petitioner could make this argument because the nature of the

argument is apparent from the record (*see* ECF No. 16 at 8-9); thus, he would be barred from

raising it in a motion to vacate the judgment. Accordingly, this issue is deemed exhausted but

procedurally defaulted. *Jackson,* 763 F.3d at 143-44.

## IV.  Sentencing

The petitioner claims that his sentence violated the Eighth Amendment because it was

premised on an inaccuracy in his pre-sentencing report. This claim is not cognizable on federal

habeas corpus review. "[I]t is well settled that 'no federal constitutional issue is presented where

the sentence is within the range prescribed by state law.'" *White v. Keane,* 969 F.2d 1381, 1383

(2d Cir. 1992) (per curiam); *Veliz v. Griffin,* No. 17-CV-0824, 2017 WL 836560, at *3

(E.D.N.Y. Mar. 2, 2017) ("It is well established that when a sentence falls within the range

prescribed by state law, the length of the sentence may not be raised on habeas corpus review.")

The petitioner was sentenced to a prison term of twenty-four years to be followed by five years

of post-release supervision for attempted murder, a class B violent felony. *See* N.Y. Penal Law §

70.02(1)(a) (McKinney 2018). This sentence was a permissible sentence for a class B violent

14

felony.  *See* N.Y. Penal Law § 70.02(3)(a) (McKinney 2018).  Accordingly, no federal

constitutional issue is presented for habeas review.

## CONCLUSION

The petition for writ of habeas corpus is denied in its entirety.  The case is dismissed.  A

certificate of appealability will not be issued.  *See* 28 U.S.C. § 2253(c).


**SO ORDERED.**

s/Ann M. Donnelly

Ann M. Donnelly
United States District Judge


Dated: Brooklyn, New York
      September 6, 2019